UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JACOBÉ HALSEY

Plaintiff,

v.

THOMAS ARMSTRONG; DOUGLAS
DOHERTY; and JUDY GILMORE,

Defendants.

Civ. No. 2:15-CV-02004-AC

OPINION AND
ORDER

---

ACOSTA, Magistrate Judge:

## Introduction

Plaintiff Jacobé Halsey ("Halsey") brings this action pursuant to 42 U.S.C. § 1983 and

the Religious Land Use and Institutionalized Persons Act against three Oregon Department of

Corrections ("DOC") employees (collectively "Defendants") alleging violations of his

constitutional and civil rights while incarcerated in the Oregon state prison system. Specifically,

Halsey, who is a Muslim, alleges Defendant Douglas Doherty ("Doherty") violated his rights to

free exercise of religion by making "disrespectful comments about [Halsey] being a Muslim"

and incorrectly informing Defendant Thomas Armstrong ("Armstrong") that Halsey had

habitually broken fast, resulting in Halsey's removal from Ramadan participation for failure to comply with fasting requirements. (Compl., at 4.)[1] Halsey similarly maintains that Armstrong removed Halsey from Ramadan fast on July 12, 2014, and thereafter precluded Halsey from engaging in any religious activities. Finally, Halsey alleges that Defendant Judy Gilmore, Superintendent of Snake River Correctional Facility ("SRCI") ("Gilmore"), was aware of Doherty's and Armstrong's violative conduct but did nothing to remedy the situation. Defendants now move for summary judgment on Halsey's claim, arguing he failed to properly exhaust available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). For the reasons stated below, Defendants' motion is granted.[2]

*Background*

Halsey is a DOC inmate currently housed at SRCI; he was most recently admitted to DOC custody on May 1, 2014. (Compl., at 4; Taylor Decl. ¶ 4.) Beginning in early June 2014, Halsey sought participation in a DOC-sanctioned Ramadan fast, an opportunity for Muslim inmates to participate in a holy month of fasting, prayer, and self-accountability. (Attach. to Compl., at 20-21, 24 & 25.) However, Armstrong, SRCI's Chaplain and individual tasked with overseeing Ramadan participation at SRCI, denied Halsey's request to participate, citing "electronic records of [Halsey's] past religious acitivit[ies]," which indicated Halsey solely participated in non-Islamic religious activities. (Attach. to Compl., at 19, 25.)

---

[1]FED. R. CIV. P. 10(b) requires parties to state claims in numbered paragraphs; however, the generic form provided for prisoners to file a civil rights complaint does not number the paragraphs. Therefore, to the extent the court cites to the Complaint, the court will cite to the page number.

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

Despite rejection, Halsey continued to protest Armstrong's decision. (Attach. to Compl., at 20-21, 24.) On June 5, 2014, Halsey sent Armstrong an inmate communication form in which Halsey stated that he was a longtime Muslim, was being denied his First Amendment right to religious freedom, and vehemently requested that Armstrong "place [Halsey] on the list for the Ramadan fast." (Attach. to Compl., at 24.) In the same inmate communication form, Halsey also noted that his family had converted to Islam prior to his birth and that Halsey had professed his faith to Islam by reciting the Shahada. (Attach. to Compl., at 24.) Upon receipt of Halsey's inmate communication form, Armstrong directed Halsey to provide him with confirmation that he performed the Shahada. (Attach. to Compl., at 24.) Halsey verified that he "took Shahada" and Armstrong subsequently added Halsey to DOC's Ramadan list. (Attach. to Compl., at 20-21.)

On July 12, 2014, however, Halsey was immediately "removed from Ramadan participation . . . for not comply with fasting." (Attach. to Compl., at 2.) Indeed, Armstrong had been informed by prison housing staff that, within the first two weeks of the Ramadan fast, Halsey had broken the fast by receiving or attempting to receive "six meals outside the fast [Halsey] requested to participate in." (Attach. to Compl., at 10.) Thus, because DOC apparently does not allow inmates to continue to participate in Ramadan if they habitually break the fast, Armstrong removed Halsey from Ramadan participation. (Attach. to Compl., at 10.)

I.  Inmate Discrimination Complaints

Following his removal, Halsey submitted two inmate discrimination complaints, Discrimination Complaint Nos. SRCI.2014.07.222 and SRCI.2014.07.221, alleging that he was discriminated against by Doherty and Armstrong when they removed him from Ramadan participation. (Attach. to Compl. at 3-4, 7-8.) In the first discrimination complaint,

SRCI.2014.07.222, Halsey argued that the "sack meals" provided to inmates participating in Ramadan were insufficient to maintain daily caloric needs. (Attach. to Compl., at 4.) Halsey also pointed out that, while he had indeed taken five lunch trays during the first two weeks of the fast, inmates participating in Ramadan were allowed to do so, and there was no communication from prison staff to inmates that doing so constituted habitually breaking the fast. (Attach. to Compl., at 3-4.) Finally, Halsey argued that his Qur'an, prayer rug, and "other religious materials" had been taken from him and were not provided to him "during [his] Ramadan fast," contravening his "right to participate in . . . religious services." (Attach. to Compl., at 4.)

In his second discrimination complaint, SRCI.2014.07.221, Halsey similarly argued that he had taken four or five lunch trays from Doherty, who had been serving lunch trays, but that he had simply taken items off the trays to save "for after sunset," when Muslims are permitted to break fast. (Attach. to Compl., at 7.) Halsey also argued that Doherty had been harassing him by telling Halsey that he was not a true Muslim and that he was "going to take his little Muslim food" to prevent Halsey from fasting. (Attach. to Compl., at 7.) Finally, Halsey indicated that Doherty had told Halsey he could not take lunch trays; however, when Halsey pressed him to name the specific rules forbidding such action, Doherty replied that he received the information from an internal memo sent from Armstrong to prison staff but not provided to inmates. (Attach. to Compl., at 7-8.) Because the memo was not provided to inmates, Halsey argued, as he did in his first complaint, he had no way of knowing that he was wrongly, and habitually, breaking the fast. (Attach. to Compl., at 8.)

Both of Halsey's discrimination complaints were accepted by SRCI's grievance coordinator, James Taylor ("Taylor"), the person tasked with processing and recording discrimination complaints and sending complaints to those charged with responding. (Attach. to

Compl., at 5; Taylor Decl. ¶ 1.)  Taylor thereafter informed Halsey that the responses to his discrimination complaints would be combined pursuant to DOC rules, and on November 12, 2014, Mark Nooth ("Nooth"), the individual whose responsibility it was to respond to Halsey's complaints, provided Halsey with his findings.  (Attach. to Compl., at  5, 6 & 10.)

Nooth informed Halsey that, after speaking to Armstrong and Doherty, he had concluded there was insufficient evidence to support Halsey's allegations of discrimination.  (Attach. to Compl., at 6, 10.)  In particular, Nooth stated that the evidence indicated Halsey habitually broke fast, and, while inmates can habitually break fast if ill, Halsey did not indicate he was sick. (Attach. to Compl., at 6, 10.)  Additionally, Nooth informed Halsey that Doherty had denied making harassing statements but did "readily admit he notified [Halsey] that he was reporting [Halsey's] meals to [Armstrong] and that [Halsey] would be removed from Ramadan participation."  (Attach. to Compl., at 6, 10.)  Finally, Nooth notified Halsey of his right to appeal the finding, but, according to Talyor, Halsey did not do so.  (Attach. to Compl., at 6, 10; Taylor Decl. ¶¶ 48-49.)

## II. Inmate Communication Forms

In addition to the two inmate discrimination complaints, Halsey sent three inmate communication forms between July 21, 2014, and September 10, 2014, to Armstrong in which Halsey alleged, among other things: that Doherty had harassed him by telling him he was not a true Muslim and threatening to take him off his Ramadan fast; that he had seen other inmates "take lunch trays" and been told doing so was all right; that he had simply taken food off of lunch trays in an effort to store it in his cell so that he could eat it after sunset; and that Armstrong failed to inform inmates that taking too many lunch trays would constitute a habitual breaking of the Ramadan fast, which would thereby prevent such inmates from participating in

Ramadan. (Attach. to Compl., at 11-14, 15-18, 22-23 & 26.) Halsey informed Armstrong of his belief that these actions precluded him from freely exercising his religious beliefs. (Attach. to Compl., at 15, 13-14, 22 & 26.) And, while Halsey acknowledged that Ramadan had already ended and "the damage [had been] done," he asked that Armstrong allow him to participate in a post-Ramadan feast. (Attach. to Compl., at 13.)

In his responses to Halsey's inmate communication forms, Armstrong stated that he removed Halsey from the list of inmates participating in Ramadan because Halsey received "extra breakfast and [four] lunches between June 28 (Ramadan beings) and July 14," despite being informed by prison staff that Ramadan participants are not to eat lunch every day while fasting. (Attach. to Compl., at 22.) Armstrong additionally noted that, while he understood Halsey's "thinking about taking a lunch [and] saving [it] until after sunset . . . [inmates] are not authorized to save food in [their] cells . . . and [there is] no way to verify that [the lunch was saved]." (Attach. to Compl., at 19.) Third, Armstrong stated that "[t]here is no feast following Ramadan per religious services procedure." (Attach. to Compl., at 11.) And, finally, he asserted that, while he may not have notified inmates that taking too many lunch trays could constitute a habitual breaking of the Ramadan fast, the Qur'an and Hadith are "clear about fasting requirements and allowances," and he felt it unnecessary to inform practicing Muslims of the requirement, as "a Muslim would already know his faith requirements around fasting." (Attach. to Compl., at 19.)

III. Grievances

During his time at SRCI, Halsey apparently lodged four grievances unrelated to the above-mentioned discrimination complaints and inmate communication forms, one of which related to accommodations for his religious beliefs. (Taylor Decl. ¶¶ 16-31.) In that grievance,

Grievance No. SRCI 2014.07.208, Halsey argued that his Ramadan meals contained pork and were insufficient to meet daily caloric needs. (Taylor Decl. Attach. 7, at 1; Attach. to Compl., at 1.)  As required by DOC's grievance review system, Jerry Timblin ("Timblin"), SRCI's Food Services Manager, responded to Halsey's grievance, informing Halsey that staff never used pork products in "sack lunches" during Ramadan and that "[t]he portions and calories are determined by the State Dietitian and not at the local level." (Taylor Decl. Attach. 11, at 1.)  Halsey elected not to appeal Timblin's initial grievance response. (Taylor Decl. ¶ 25.)

*Standards*

Courts in the Ninth Circuit "treat an exhaustion defense under the PLRA within the framework of the Federal Rules of Civil Procedure." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (overruling *Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003)).  This means that a court should grant a motion for summary judgment premised on the prisoner's failure to exhaust administrative remedies "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Specifically, in a case when the movant argues the prisoner failed to exhaust nonjudicial remedies, the movant must produce evidence, which, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Albino*, 747, F.3d at 1169.  If the movant meets his burden, the prisoner must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).  In a failure-to-exhaust case that means the prisoner must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747, F.3d at 1172.  On summary judgment, the court is bound to view all facts in

a light most favorable to the prisoner and must draw all justifiable inferences in the prisoner's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

I. Exhaustion

      The PLRA requires that a prisoner exhaust available administrative remedies before filing suit in federal court regarding prison conditions. *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing 42 U.S.C. § 1997e(a) (2008)). Failure to exhaust under the PLRA is an affirmative defense that must be raised by the defendants, who bear the burden of proving the absence of exhaustion. *Jones v. Bock*, 549 U.S. 199, 211-12 (2007); *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).

      Exhaustion must be proper, meaning the "grievant must use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (2009). Moreover, to properly exhaust, the grievant must complete the administrative process in accordance with the prison's own grievance procedures. *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). This means the grievant must comply with the prison grievance system's "critical procedural rules" and appeal the grievance decision to its highest level within the grievance system prior to filing an action in court. *Id.* at 95; *see also Jones*, 549 U.S. at 218 (stating a prisoner must complete the administrative process in accordance with the prison's procedural rules). Simply put, the grievant must use all steps the prison administration holds out, and do so properly. *Woodford*, 548 U.S. at 90.

      However, while the inmate must comply with the exhaustion requirement, the defendant has the burden of raising nonexhaustion as an affirmative defense and to "prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."

*Albino*, 747 F.3d at 1172. Once the defendant has carried that burden, the prisoner must provide evidence showing that the existing and generally available administrative remedies were effectively unavailable to him, for instance, by showing that prison officials declined to hear the merits of a grievance, or obstructed attempts to exhaust, or prevented inmates from exhausting because procedures for processing grievances were not followed. *Id.* at 1172-73; *see also Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008) (standing for the proposition that the prisoner must show that administrative procedures were unavailable to him by showing, for instance, that prison officials obstructed the prisoner's attempt to exhaust or that the prisoner was prevented from exhausting because prison officials did not follow internal procedurals).

Oregon Administrative Rules 291-109-0100 through 291-109-0190 describe the three-level internal grievance and appeal procedure for inmates confined in DOC facilities. OR. ADMIN. R. 291-109-0100 *et seq.* (2016). Inmates are informed of the grievance process during admission and orientation, and the procedures are also explained in the inmate handbook given to each inmate. (Taylor Decl. ¶ 9.) Inmates are encouraged to first address their concerns with DOC staff through informal written or verbal communication. OR. ADMIN. R. 291-109-020 (2016). If informal resolution is unsuccessful, an inmate may initiate a grievance by filing a DOC-provided form within thirty days of the incident giving rise to the complaint. OR. ADMIN. R. 291-109-0150 (2016). If the inmate properly grieved and is not satisfied with the initial grievance response, he or she may appeal to the functional unit manager within fourteen days of receiving the grievance response. OR. ADMIN. R. 291-109-0170(1) (2016). If the first appeal is denied, the inmate can appeal the functional unit manager's decision to the Assistant Director or designee, whose decision is final and not subject to further administrative review. OR. ADMIN. R. 291-109-0170(2) (2016).

When pertinent, an inmate may pursue administrative remedies through a separate process specifically reserved for discrimination issues. Oregon Administrative Rules 291-006-0005 through 291-006-0045 describe the discrimination complaint process, which is similar to the grievance process. If an inmate believes he has been subjected to discrimination on the basis of race, color, national origin, sex, religion, age, marital status, or handicap, the inmate, or a representative for the inmate, may file a written complaint through the prison department's discrimination complaint process. OR. ADMIN. R. 291-006-0015 (2016). The complaint must be directed to the functional unit manager of the unit in which the inmate is assigned and must be filed within thirty days of the alleged act of discrimination. OR. ADMIN. R. 291-006-0031 (2016). If, after receiving a response from the functional unit manager, the inmate is dissatisfied, the inmate may appeal the response to the Inspector General or designee within fourteen days from the date the response was sent to the inmate by submitting an inmate communication form to the discrimination complaint coordinator specifically requesting review. OR. ADMIN. R. 291-006-0040 (2016). "The inmate must attach the original discrimination complaint, original attachments and the department's response" to the inmate communication form; the forms will then be forwarded to the Inspector General or designee. OR. ADMIN. R. 291-006-0040(1) (2016). The decision by the Inspector General or designee is final. OR. ADMIN. R. 291-006-0040(3) (2016). As with the general grievance process, the prisoner is required to exhaust all administrative remedies prior to bringing suit in federal court. *See Fabelo v. Andrews*, No. 05-228-ST, 2006 WL 2487320 (D. Or. Aug. 28, 2006) (standing for the proposition that a prisoner who lodges a discrimination complaint must exhaust all available administrative remedies prior to filing suit in federal court).

I.  Halsey's Failure to Exhaust

Halsey argues Defendants violated his First Amendment free-exercise rights in numerous ways.  First, Halsey argues, Doherty violated his free-exercise rights by making offensive comments about Halsey's religion and incorrectly informing Armstrong that Halsey had habitually broken fast, resulting in Halsey's removal from Ramadan participation.  Second, Halsey asserts that Armstrong wrongly removed him from Ramadan fast and subsequently precluded Halsey from engaging in any religious activities.  Finally, Halsey alleges that Gilmore was aware of Doherty's and Armstrong's conduct but did nothing to remedy the situation.  Defendants move for summary judgment on Halsey's claim, maintaining that Halsey failed to exhaust his administrative remedies prior to filing suit, as required by the PLRA, and that they are therefore entitled to summary judgment.  For the reasons discussed below, Defendants' Motion is granted.

*A.  Inmate Discrimination Complaints*

The record indicates Halsey failed to appeal his discrimination complaints to the highest level within DOC's administrative review system prior to filing suit.  Halsey filed two inmate discrimination complaints pertaining to these allegations.  In them, Halsey argued that Doherty had been harassing him by threatening to take his "Muslim food" and telling him that he was not a true Muslim.  (Attach. to Compl., at 7.)  Additionally, in response to Armstrong's explanation that Halsey was removed from Ramadan for attempting to receive meals outside of fast, Halsey asserted that the sack meals provided to inmates participating in Ramadan were insufficient to meet prisoners' caloric needs and that, as a result, he took four to five lunch trays to save "for after sunset," as other inmates participating in Ramadan had been permitted to do.  (Attach. to Compl., at 7.)  Moreover, Halsey explained, there was no communication from prison staff to

inmates that taking lunch trays could be deemed as habitually breaking the fast. Based on these assertions, Halsey argued that Armstrong wrongly removed him from Ramadan fast and prevented him from engaging in religious activities.

On November 12, 2014, Nooth responded to Halsey's discrimination complaints. In his response, Nooth stated that there was insufficient evidence to support Halsey's allegations of discrimination. Nooth notified Halsey of his right to appeal the finding. The record appears to show, however, that Halsey failed to appeal Nooth's response. The court does note, though, that Halsey did attach a "Notice of Denial" to his Complaint. (*See* Attach. to Compl., at 1.) The Notice of Denial states that a DOC investigation found no merit to Halsey's allegations regarding SRCI's denial of his ability to participate in Ramadan and that Halsey's allegation must therefore be denied in its entirety. This document could evidence an appeal of Nooth's response, but Halsey failed to provide the court with any explanation as to the document's origins or relation, if any, to Halsey's discrimination complaints – or any other grievance or complaint. Simply put, the court has no way of knowing whether this document evidences an appeal. Absent any other evidence, the court is left to rely on Taylor's declaration, which states that Halsey failed to appeal Nooth's response – and, for that matter, any other grievance or complaint – to the highest level within the grievance system prior to filing this action.

### B. Grievance

The record also shows Halsey failed to exhaust his administrative remedies with respect to the grievance he filed relating to this matter. Halsey filed Grievance No. SRCI 2014.07.208, arguing his Ramadan meals contained pork and were insufficient to meet daily caloric needs, a violation of SRCI's duty to accommodate his religious practices. Pursuant to DOC's grievance review system, Timblin responded to Halsey's grievance, notifying Halsey that staff never used

pork products in sack meals during Ramadan and that portion sizes and calories are set by the state dietitian, not at the local level. Halsey did not to appeal Timblin's response to the functional unit manager, as he is allowed to do under OR. ADMIN. R. 291-109-0170(1). Consequently, Halsey failed to appeal the grievance decision to its highest level within DOC's grievance system prior to filing this action.

C. *Inmate Communication Forms*

Aside from the two inmate discrimination complaints and single grievance, there is no indication in the record that Halsey submitted any other grievances or discrimination complaints pertaining to his claim for relief. Halsey did file a number of inmate communication forms pertaining to these issues, but such forms, by themselves, are not "attempts to grieve" within DOC's formal grievance procedures. *Tolle v. Or. Dep't of Corr.*, No. 2:11-cv-00980-MO, 2012 WL 775060, at * 2 (D. Or. Mar. 6, 2012) (holding that inmate communication forms are not "attempts to grieve") (internal quotations omitted). Rather, inmate communication forms are entirely separate from formal grievances and are "designed for inmate use in communicating with employees, volunteers, or contractors," and, where appropriate, receiving responses from the same. (*See* Taylor Decl. Attach. 2, at 2.) In short, they do not constitute a formal step in the administrative review process, and, therefore, their use does not constitute exhaustion of the administrative process. Consequently, the record demonstrates that Halsey failed to exhaust his administrative remedies prior to bringing this action.

D. *Halsey's Burden to Show the Court That Available Remedies Were Made Unavailable to Him*

Because the Defendants carried their burden by showing the court that Halsey had administrative remedies available and that he did not exhaust them, Halsey was required to provide the court with evidence showing there is something in his particular case that made the

existing and generally available administrative remedies effectively unavailable to him. Halsey, however, has not provided the court with any evidence that the existing and generally available administrative remedies were unavailable to him; indeed, he did not even respond to Defendants' summary judgment motion. Thus, the record shows Halsey did not exhaust his administrative remedies prior to bringing this action, and Defendants' summary judgment motion must necessarily be granted.

### Conclusion

For the reasons stated above, Defendants have shown that Halsey had administrative remedies available and failed to properly exhaust those remedies. The burden thus shifted to Halsey to direct the court to evidence showing that the existing and generally available administrative remedies were effectively unavailable to him. Halsey failed to meet that burden. Consequently, Defendants' Motion for Summary Judgment (Dkt No. 16), based on the PLRA's exhaustion requirement, is GRANTED.

DATED this 28th day of April, 2016.

JOHN V. ACOSTA
United States Magistrate Judge

OPINION AND ORDER                    14                    {TJK}